# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### February 4, 2014 Session

## STATE OF TENNESSEE v. BRANDON CHURCHMAN

**Appeal from the Criminal Court for Shelby County**
**No. 11-03841      W. Mark Ward, Presiding Judge**

_____

**No. W2013-00175-CCA-R3-CD  - Filed April 28, 2014**

_____

The defendant was convicted by a jury of reckless homicide, first degree (felony) murder and two counts of facilitation of attempted first degree murder. These convictions all sprang from an incident in which shots were fired at three men in a car during an attempted robbery. To establish the defendant's identity as the murderer the State introduced evidence at trial of a separate carjacking and shooting committed by the defendant and an accomplice several hours prior to the homicide. The defendant, who had pled guilty to the attempted first degree murder of the carjacking victim prior to trial on the instant charges, asserts on appeal that the two incidents were subject to mandatory joinder and that he could not be tried for the charges in the present indictment after he had pled guilty to the attempted first degree murder. He also appeals the trial court's decision to admit the evidence of the carjacking, the trial court's limits on cross-examination of a witnesses, the trial court's evidentiary decisions regarding hearsay, and the trial court's denial of a mistrial. After a thorough review of the record, we conclude that there was no error and we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Cornelius K. Bostick, Anna R. Smith, and Rochelle McCrackin, Memphis, Tennessee, for the appellant, Brandon Churchman.

Robert E. Cooper, Jr., Attorney General & Reporter; Sophia S. Lee, Senior Counsel; Amy P. Weirich, District Attorney General; and Alanda Dwyer and Abby Wallace, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The record shows that the defendant and co-defendant Alvin Gray were indicted on June 9, 2011, for first degree (premeditated) murder, for first degree murder committed in the course of an attempted robbery, for two counts of attempted first degree murder, and for employment of a firearm during the commission of a dangerous felony.

According to the proof introduced at trial, the defendant and Mr. Gray committed an armed robbery against Lee Broyles at a carwash on the night of June 10, 2007. During the robbery, Mr. Broyles's distinctive Chrysler 300 was taken, and Mr. Broyles was shot multiple times, including once in the jaw. In the early morning hours of June 11, 2007, the occupants of a distinctive Chrysler 300 approached a Crown Victoria with many after-market additions and shot at the three occupants, killing the driver, Mel Owens. They followed the vehicle around a corner and fired shots at the two surviving men, who ran away. Discovering the body of the driver slumped in the seat, the men in the Chrysler left. Mr. Broyles's Chrysler was discovered burning later that morning in a vacant lot.

The defendant and Mr. Gray were indicted for offenses related to the shooting and carjacking of Mr. Broyles. The defendant's brief relates the sequence of events as follows. On March 18, 2008, the defendant and Mr. Gray were indicted for the attempted first degree murder and especially aggravated robbery of Mr. Broyles; on February 5, 2009, the defendant and Mr. Gray were indicted for first degree (premeditated) murder, two counts of attempted first degree murder and employment of a firearm during the commission of a dangerous felony for the crimes committed on June 11, 2007; on May 21, 2009, the defendant and Mr. Gray both pled guilty to attempted first degree murder of Mr. Broyles and were each sentenced to twenty-five years' imprisonment. The defendant and Mr. Gray were subsequently re-indicted on June 9, 2011 for the crimes committed on June 11th, and apparently an alternative charge of first degree felony murder was added. The record, however, does not contain the 2008 or 2009 indictments, the technical records of the 2008 or 2009 indictments, or the guilty pleas entered for the shooting of Mr. Broyles, although the parties refer to the new indictment during the pretrial hearings. The parties also agreed not to refile the motions from the prior indictment, and the trial court cautioned that the technical records of both indictments would need to be included on appeal. Discovering the absence of the documents related to the prior indictments, the defendant moved this court to supplement the record with the two indictments and associated affidavits of complaint "in order to convey a fair and accurate account of what occurred in the trial court." The State opposed the motion based on the fact that the documents were not part of the record before the trial court and based on the defendant's failure to explain why they were necessary. This

court denied the motion to supplement the record because the defendant had not explained why the documents were necessary.

Prior to trial, the defendant moved to dismiss the charges related to the June 11th shooting, arguing that the shooting of Mr. Broyles and the June 11th crimes were subject to mandatory joinder and that because he had already pled guilty to the crime against Mr. Broyles, the State was barred from prosecuting him separately for the murder of Mel Owens and the related crimes. The trial court denied the motion, relying on prior findings and concluding that the events were not part of a single criminal episode. At a subsequent hearing on the same issue, the trial court noted that the defendant had not moved to consolidate the cases but had pled guilty to the crime against Mr. Broyles while he was aware that the other indictment was in existence. The prosecution represented to the trial court that, at the time the guilty pleas were entered, the State had indicated in the record that it intended to use the evidence of the attempted murder of Mr. Broyles in the subsequent indictment. The trial court accordingly rejected the motion not only because the offenses were not part of a single criminal episode but also because it concluded the issue was waived.

The defendant also filed a motion to exclude evidence of the attempted first degree murder of Mr. Broyles. The trial court decided that it would exclude the actual conviction but allow proof of the facts pertaining to the shooting of Mr. Broyles under Tennessee Rule of Evidence 404(b). The trial court found that the evidence was relevant to identity and that the evidence was relevant to give context to the events. The trial court found that the probative value was not outweighed by the danger of unfair prejudice, and accordingly, the evidence was introduced to the jury.

At trial, the State presented the testimony of the two surviving occupants of the car, brothers Terrence Edwards and Charles Owens, who were the cousins of the deceased victim, Mel Owens. Both testified that the three had decided to go to the Premiere Club earlier in the evening, that Charles Owens had briefly entered the club, and that the three had spent several hours driving around the packed parking lot of the club and a parking lot across the street, socializing. The men were in Charles Owens's distinctive lime-gold Crown Victoria, which had several after-market additions. When they reached Charles Owens's South Memphis home between 2:00 and 3:00 a.m. on June 11, 2007, Mel Owens was driving, Charles Owens was in the passenger's seat, and Terrence Edwards was in the backseat, which could not be opened from inside the car. The three were sitting in the car in the driveway, discussing who would spend the night at the house. Terrence Edwards testified that Mel Owens then said, "[Y]ou-all duck. He's fixing to shoot," and began backing up. Charles Owens testified that Mel Owens put the car in reverse before instructing the brothers to duck. Both brothers saw a man standing close to the house move up the driveway. The man fired into the car when it had reached the street and started to drive away, and glass

-3-

shattered. Terrence Edwards testified the man fired once, and Charles Owens testified he shot twice. Having backed out of the driveway, Mel Owens began driving down the street, but he appeared distressed. The brothers asked him if he had been shot, but he could not speak to answer, merely patting his side to indicate his injury. Charles Owens steered the vehicle until Mel Owens could no longer press the gas and it came to a stop. Charles Owens exited the car to assist Mel Owens. Charles Owens testified that he told his brother that he thought their cousin was dead. Then both brothers witnessed the Chrysler come around a corner and hit the brakes. A man exited the car and shot at them. Terrence Edwards had to climb over the front seat of the Crown Victoria to escape the vehicle, and both ran away and hid in a nearby wooded area. Terrence Edwards saw the Chrysler pull up to the Crown Victoria and stay for a short while, then pull away. Charles Owens confirmed that the Chrysler pulled up and also saw the shooter go up to the driver's side of the Crown Victoria, grab the door, look back at the Chrysler, and say something. The shooter returned to the Chrysler and the Chrysler left. The Crown Victoria was not taken. Charles Owens testified that the men would have had to have moved his cousin's body to take the vehicle; Mel Owens, a high school football player, weighed 264 pounds according to the autopsy.

Both brothers testified that it was dark and difficult to see. Terrence Edwards could not give a description of the shooter, but he was able to identify a picture of the Chrysler 300, which he testified had distinctive chrome additions. On cross-examination, however, he acknowledged that he was not sure it was the same Chrysler 300. He acknowledged having told police that the shooter was average height and wearing a black shirt.

Charles Owens testified that the shooter wore dark clothing, long shorts, and a baseball cap, that his hair was fixed in short dread locks or braids, and that he had a goatee. He was not able to pick the defendant from a photographic lineup but told police that the shooter had a goatee like the one in the defendant's photo. He also testified that he was a car enthusiast and that the Chrysler had several distinctive after-market additions, including a grill and blue headlights. He believed the vehicle was the same as the one depicted in a photograph of Lee Broyles's vehicle. Charles Owens acknowledged on cross-examination that he had not told the police about the baseball cap and had described the shooter's hair as "dreads like Buckwheat."

The defense sought to question Charles Owens regarding an incident which had taken place at the Premiere Club and which he had recounted to the police. According to his statement to police, a green Expedition had hit his girlfriend's car and then someone in the car had shown a gun. However, in a jury-out hearing, Charles Owens testified that he did not have first-hand knowledge of this incident but could only repeat what his girlfriend had told him. Charles Owens did personally pass a green Expedition at the club. His girlfriend had written down the tags of the car which hit her, and Charles Owens tried to read the tags of

the car passing him to see if they matched, but he was not able to see the number entirely. Charles Owens acknowledged that he may have told police that the people in this car made a comment admiring how "clean" his Crown Victoria was. The trial court ruled that the testimony regarding the gun and tags was hearsay but allowed defense counsel to ask if someone had commented on the car at the club.

Charles Owens's neighbor Elijah Baggett also witnessed the Chrysler at the scene. He testified he got home around 3:00 a.m. and saw a black, blue, or purple Chrysler 200 with a chrome grill and blue or blurred headlights, and he identified a picture of Lee Broyles's vehicle. While he was in his house, he heard two shots. He saw Charles Owens's car going down the hill and saw another car follow it. Officer Keith Crosby, who was dispatched to the scene at 4:23 a.m., passed a Chrysler 300 with a chrome grill traveling in the opposite direction and speeding. Because he was on his way to the crime scene, he did not stop the speeding vehicle, but later realized that the vehicle matched the description of one stolen earlier in the night.

Mark Crawford, a Memphis firefighter, responded to a call regarding Mr. Broyles's burning Chrysler, which was identified through the license plate, at 5:00 a.m. on June 11, 2007. No physical evidence was recovered from the car, which had been set on fire. The car was found at a location in North Memphis within walking distance of both the defendant's house and Mr. Gray's house.

Sergeant Anthony Mullins, who investigated the crime, testified regarding Charles Owens's description of the shooter. He acknowledged that Charles Owens was not able to pick the defendant out of a photographic lineup, that he did not mention a baseball cap, and that Sergeant Mullins's supplement did not mention braids or dreads. He testified, however, that Charles Owens had told him the perpetrator had "Buckwheat braids or dreads or something."

During cross-examination, the trial court ruled it would allow defense counsel to question Sergeant Mullins about Charles Owens's girlfriend's encounter with the green Expedition but would instruct the jury that the information was to be considered only in evaluating Sergeant Mullins's investigation and not for the truth of the matter asserted. Trial counsel asked if he could ask whether someone had pulled a gun on Charles Owens's girlfriend, and the trial court responded, "Why don't you just ask him what information he received instead of you trying to testify in front of this jury." When the trial court ruled that it would allow the evidence but not for the truth of the matter asserted, defense counsel responded:

Mr. Bostick: Okay. So basically I just can't lead him on this.

I'll just have to ask him if he can just explain in his own words and go from there. Right? I can't lead him. I'm – I'm happy to get that. I'll take what I can get.

The Court: Well, I'm afraid if you start leading, you'll just go –

Mr. Bostick: Yes. Yes, Your Honor. I'll take what I can get.

In front of the jury, Sergeant Mullins testified that Charles Owens had told him that there had been an altercation between his girlfriend and someone in a green Expedition, that he had encountered the car, and that someone had shown a gun to him or to his girlfriend. Sergeant Mullins stated that he ran the license plate of the Expedition but did not interview the girlfriend or further investigate because everyone at the scene of the shooting had seen a Chrysler. On redirect examination, the trial court allowed the State to bring out that the defendant and Mr. Gray had been developed as suspects because the car at the shooting matched Mr. Broyles's car and because they were seen in the Chrysler at the Premiere Club, again providing a limiting instruction to the jury that the evidence was relevant only to the officer's investigation.

The State introduced the testimony of the co-defendant, Alvin Gray, to link the defendant to the shooting. Mr. Gray testified that he had pled guilty to facilitation of first degree murder in the current indictment and that he was serving a twenty-five year sentence which was concurrent to his twenty-five year sentence for the attempted first degree murder of Mr. Broyles in exchange for his testimony. He testified that he and the defendant had discussed "doing something" to get money before leaving the apartment on June 10, 2007, and that they decided to rob Mr. Broyles when they saw him at the carwash. Mr. Gray testified that he had a gun and he walked up to Mr. Broyles and asked for his keys. When Mr. Broyles refused, Mr. Gray hit him with the gun. The three men struggled, and Mr. Broyles dropped the keys. The defendant and Mr. Gray attempted to leave, but before Mr. Gray got in the car, Mr. Broyles shot, and Mr. Gray returned fire. Mr. Gray drove, and the defendant was in the passenger's seat.

The men "stopped in some apartments and . . . sat over there for a while." They then drove around at the Premiere Club, where they were joined by a third man whom Mr. Gray did not know well. The three men took turns driving. They left the club and saw the Crown Victoria on the way home. At this point, Mr. Gray was in the backseat, the defendant was in the passenger's seat and the third man was driving. Mr. Gray testified that he was shaken by the earlier incident and had left the gun in the front seat and had not touched it since. The defendant and third man discussed taking the car, and when the Crown Victoria stopped at

Charles Owens's home, the defendant got out at the house next door. The Chrysler made a u-turn. The Crown Victoria backed out of the driveway, and the defendant fired twice. The defendant got in the passenger's seat of the Chrysler, and they followed the car. When the car stopped, the defendant fired three or four shots from inside the vehicle, and two men ran away. They pulled up, and the defendant and Mr. Gray both got out. They saw the dead man and decided to leave. The third man drove toward his home and left. The defendant and Mr. Gray then decided to burn the car and did so at a vacant lot within walking distance of both of their homes.

To corroborate the testimony of Mr. Gray, the State also introduced testimony and physical evidence tending to link the June 11th shooting to the shooting of Mr. Broyles. The trial court overruled the defendant's objection to this evidence, concluding that the testimony was necessary to complete the story of the crime and to establish the defendant's identity. Mr. Broyles testified that on the night of June 10, 2007, he and another man took his midnight pearl blue Chrysler 300 with a chrome grill and other after-market additions to the carwash. Two "shady" men came up and asked him for money for breakfast, but he refused when they said they wanted $7 each. The shorter man, whom Mr. Broyles described as having a goatee and whom he later identified as the defendant, became angry and started cursing him. The taller man then pulled out a gun, and Mr. Broyles tried to pull his gun out of his jacket pocket. The defendant bear hugged him from behind to keep him from getting his gun. The tall man shot Mr. Broyles, and Mr. Broyles, who had his hand on his gun but could not remove it, shot through his own coat. The defendant then tore off Mr. Broyles's coat and the taller man shot him several times, mostly in the legs and once in the jaw. The two drove off in the car, with the defendant in the passenger's seat. Mr. Broyles was able to pick the defendant from a photographic lineup and stated in court that the defendant "looks exactly like" the perpetrator.

The State also introduced a video from the carwash which showed some part of the attack on Mr. Broyles. One of the perpetrators had on long shorts and a baseball cap and had a long goatee.

The State also introduced the defendant's statements to police regarding the shooting of Mr. Broyles. Detective Walter Gunn testified that the defendant at first asserted that he had been with his brother the night of the shooting, then implicated a person called Kenny. In his statement, the defendant admitted to participating in the robbery at approximately 10:10 p.m. on June 10, 2007. He tried to cast the blame primarily on Kenny by asserting that Kenny suggested the robbery and that Kenny essentially accomplished the robbery after the defendant himself had turned to go when Mr. Broyles refused to give him money. After being shown photographs of several persons named Kenny who matched the description he had given, the defendant implicated one of them. Law enforcement spent several hours

riding around with the defendant and looking for Kenny, but after locating and interviewing him, officers determined that the person the defendant had turned in was not involved in the crime.

The State introduced evidence that four bullet casings and two fragments were recovered from the carwash and that one bullet fragment was recovered by medical personnel from Lee Broyles. Two casings were recovered from the street in front of Charles Owens's house, and four casings were recovered from the street where the Crown Victoria came to a stop. Two bullet fragments were recovered from the car, and a bullet fragment was recovered from the body of Mel Owens. While none of the bullet fragments could be conclusively linked to one another or to a particular weapon, Cervinia Braswell testified that all of the cartridge casings – four from the carwash, two from Charles Owens's house, and four from the street next to the Crown Victoria – were fired from the same weapon. The murder weapon was never found.

The defendant introduced the testimony of Amber Jones, the ex-wife of a close friend of Charles Owens. Ms. Jones testified that about one month before the shooting, she was driving by Charles Owens's home in the middle of the night because she suspected her ex-husband was lying about his whereabouts, and she saw a light blue or white vehicle which may have been a Chrysler 300 parked in front of the house with two people lying down in the seats.

The jury convicted the defendant of the lesser-included offense of reckless homicide in the first count, of felony murder in the second count, and of two counts of facilitation of attempted first degree murder. The State dismissed the weapons charge, which was based on a statute passed after the crime was committed. The trial court merged the reckless homicide into the felony murder conviction and sentenced the defendant to life in prison for the felony murder conviction and to two ten-year sentences for each of the facilitation of attempted first degree murder convictions. The facilitation of attempted first degree murder convictions were to be served concurrently with one another but consecutively to his life sentence for an effective sentence of life plus ten years. The defendant appeals, asserting that the trial court erred in denying his motion for dismissal based on mandatory joinder; in allowing in evidence of the shooting of Mr. Broyles; in limiting his cross-examination of Sergeant Mullins and Charles Owens; and in denying his motion for a mistrial.

**ANALYSIS**

**I. Mandatory Joinder**

The defendant maintains that his convictions must be reversed because the shooting

of Mr. Broyles and the crimes of June 11th are subject to mandatory joinder, and his guilty plea to the one prevents his prosecution in the other. In *State v. Baird*, this court concluded that the trial court's factual findings related to mandatory joinder under Tennessee Rule of Criminal Procedure 8(a) were binding on appeal unless the evidence preponderated otherwise and that the trial court's legal conclusions and application of law to the facts were reviewed de novo. *State v. Baird*, 88 S.W.3d 617, 620 (Tenn. Crim. App. 2001); *see also State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999) (holding that the proper standard of review for claims under Rule 8(b) or Rule 14 is abuse of discretion but stating that the new Rules, including mandatory joinder, have significantly limited the court's discretion); *compare State v. Schiefelbein*, 230 S.W.3d 88, 125 (Tenn. Crim. App. 2007); *State v. Thompson*, 88 S.W.3d 611, 613 (Tenn. Crim. App. 2000) (noting that in cases of mandatory joinder, the trial court retains discretion to sever under Rule 14). Likewise, the Tennessee Supreme Court in *State v. Johnson* conducted a de novo review of the trial court's application of Rule 8(a) when the facts had been stipulated by the parties. *State v. Johnson*, 342 S.W.3d 468, 471-72 (Tenn. 2011). Accordingly, we review the trial court's legal conclusions and application of law to the facts de novo. The trial court's findings of fact are binding if the evidence does not preponderate otherwise.

Tennessee Rule of Criminal Procedure 8(a) governs the mandatory joinder of offenses. Under Rule 8(a):

> Two or more offenses shall be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or the offenses consolidated pursuant to Rule 13, if the offenses are:
>
> (A) based on the same conduct or arise from the same criminal episode;
>
> (B) within the jurisdiction of a single court; and
>
> (C) known to the appropriate prosecuting official at the time of the return of the indictment(s), presentment(s), or information(s).

Tenn. R. Crim. P. 8(a)(1). Failure to join crimes governed by the rule of mandatory joinder prevents any subsequent prosecution, unless the crimes have been severed at the behest of the parties under Tennessee Rule of Criminal Procedure 14. Tenn. R. Crim. P. 8(a)(2); *Johnson*, 342 S.W.3d at 473.

One of the driving reasons of policy behind the mandatory joinder rule is "to stop the practice by some prosecuting attorneys of 'saving back' charges because this practice necessitates multiple trials and adversely affects discovery, plea bargaining, and other pre-trial procedures." *Johnson*, 342 S.W.3d at 473; Tenn. R. Crim. P. 8(a) ("The commission wishes to make clear that section (a) is meant to stop the practice by some prosecuting attorneys of 'saving back' one or more charges arising from the same conduct or from the same criminal episode."). The Advisory Commission's Comment to Rule 8(a) notes that the Rule is also designed to encourage the disposition of offenses based on the same conduct or criminal episode in one trial. *See also State v. Carruthers*, 35 S.W.3d 516, 573 (Tenn. 2000) (appendix) ("The purpose of Rule 8 is to promote efficient administration of justice and to protect the rights of the accused."). To prevent the prosecution from pursuing piecemeal litigation or getting a second bite at the apple, "[s]uch other charges are barred from future prosecution if known to the appropriate prosecuting official at the time that the other prosecution is commenced, but deliberately not presented to a grand jury." Tenn. R. Crim. P. 8 advisory comm'n cmt; *see Baird*, 88 S.W.3d at 621 ("The policy behind Rule 8(a) is to avoid piecemeal litigation and to disallow the 'saving back' of charges arising from the same conduct or same criminal episode."). The Advisory Commission's Comment reiterates that the language is to be construed to prevent "a deliberate and willful 'saving back' of known charges for future prosecution." Tenn. R. Crim. P. 8 advisory comm'n cmt. Accordingly, an offense which would normally be subject to mandatory joinder may be tried in a subsequent prosecution if the failure to join was due to the refusal of the grand jury to act on the charge and not due to a willful and deliberate choice of the prosecution. *Id.*

Under Tennessee Rule of Criminal Procedure 12(b)(2)(E), a motion to sever or consolidate[1] charges must be made prior to trial. In *Spicer v. State*, the Tennessee Supreme Court, interpreting the prior version of Rule 12, confirmed that motions for consolidation of charges must be made prior to trial. *Spicer v. State*, 12 S.W.3d 438, 444 n.6 (Tenn. 2000). The *Spicer* court also noted that normally, a motion regarding severance which is not made appropriately and prior to trial is waived. *Id.* at 443-44 (concluding that the defendant had not waived his issue regarding severance because he objected to the State's motion to consolidate).

In this case, the record indicates that the defendant pled guilty to the charge in the first indictment. According to the trial court's oral findings, which are binding on this court, the defendant was aware of the second indictment, which charged the offenses committed on June 11th, at the time he pled guilty. He did not move for consolidation. During a hearing, the trial court discussed with the attorneys for the defendant and Mr. Gray (neither of whom

---

[1]While Rule 12(b)(2)(E) cites a "Rule 14 motion to sever or consolidate charges or defendants," the text of Rule 14 provides only for the severance of charges or defendants.

had yet been appointed at the time of the pleas) the possibility that this was a tactical decision.

Based on the record, we conclude that the defendant's claim that the charges in the first indictment and the charges in the second indictment were required to be tried together has been waived. The driving policy behind Rule 8(a), preventing "a deliberate and willful 'saving back' of known charges for future prosecution," is not violated when the defendant is aware that he is being charged with two indictments and pleads guilty to one without moving for consolidation. In evaluating a claim for dismissal due to a violation of mandatory joinder, courts have looked to the policy behind the Rule. In *State v. Carruthers*, the defendant was indicted on two sets of charges and the charges were ultimately consolidated for one trial. *Carruthers*, 35 S.W.3d at 572 (Tenn. 2000) (appendix). On appeal, the defendant argued that the second indictment violated Rule 8. The Tennessee Supreme Court, however, rejected the argument, noting that the limitations in the Rule were designed to avoid the prosecutorial abuse of saving back charges, and that "[t]his concern . . . [was] not present in the case at hand because the subsequent indictments were returned well before the start of trial." *Id.* at 573 (appendix).

We note further that the Advisory Commission Comment to the Rule provides an exception to consolidation for charges normally mandatorily joined but tried separately due to the actions of the grand jury rather than the prosecution. In this case, likewise, the failure to consolidate cannot be attributed to the State. Preventing subsequent prosecution on a second indictment of which the defendant was aware at the time of the guilty plea would amount to the "type of windfall [which] was not contemplated by the drafters of the Rules." *Carruthers*, 35 S.W.3d at 573 (appendix) (concluding separate indictments could be consolidated prior to trial).

In the case at bar, however, the record indicates that the defendant was convicted on a superseding indictment which was returned after his guilty plea. The defendant attached to his motion to supplement the record copies of the indictment regarding the shooting of Mr. Broyles and of the preceding indictment for the June 11th crimes. These documents tend to show that the superseding indictment added a charge of first degree felony murder to the existing charge of premeditated murder; Mr. Gray's counsel also referred at a pretrial hearing to the new indictment's addition of a felony murder charge. It was on this felony murder charge that the defendant was sentenced, as the jury found him guilty of the lesser-included offense of reckless homicide on the premeditated murder charge and the convictions were merged.

We previously denied the defendant's motion to supplement the record based on the defendant's failure to explain how the supplemental materials were necessary for the

-11-

determination of the issues he raised. Accordingly, the materials showing that the felony murder charge was added in a superseding indictment are not technically before this court. We further note that, although the defendant renewed his motion regarding mandatory joinder countless times, he never argued before the trial court that the additional count in the superseding indictment, in particular, violated Rule 8(a). The trial court initially denied the motion based on both a finding that the charges did not stem from the same criminal episode and on a finding that the defendant had waived any complaint by entering a guilty plea while aware that the other indictment had not yet been tried. The defendant renewed the issue numerous times, and the trial court merely relied on its previous findings. The defendant never asked the trial court to reconsider the motion in light of the addition of a new charge in the new indictment. The record, however, also reflects that the issue was raised so frequently that the trial court (jokingly) threatened during the trial to hold defense counsel in contempt if it was raised again. While the issue appears to be waived for failure to include the relevant documents in the record, we nevertheless proceed to analyze the defendant's issue, and we conclude that the crimes in this case were not subject to mandatory joinder.

Rule 8 provides for the mandatory joinder of crimes based on the same conduct or arising from the same criminal episode. As the crimes here are not the result of the same conduct, the defendant urges that they are part of the same criminal episode. The Tennessee Supreme Court recently adopted the criteria for determining what constitutes the "same criminal episode" set out in the ABA Standards for Criminal Justice:

> "Single criminal episode" offenses normally are generated by separate physical actions. The actions may be committed by separate defendants. In other respects, however, they are similar to same conduct offenses: they occur simultaneously or in close sequence, and they occur in the same place or in closely situated places. A critical characteristic of single episode offenses, particularly in cases involving otherwise unrelated offenses or offenders, is the fact that proof of one offense necessarily involves proof of the others.

*Johnson*, 342 S.W.3d at 474 (quoting 2 ABA Standards for Criminal Justice § 13–1.2 cmt., at 13.10) (footnotes omitted). The Tennessee Supreme Court elaborated that crimes that are part of the same criminal episode "must occur simultaneously or in close sequence and must occur in the same place or in closely situated places." *Johnson*, 342 S.W.3d at 475. The court further admonished that "[a] break in the action may be sufficient to interrupt the temporal proximity required for a single criminal episode to exist." *Id.* Courts, however, must also focus on whether proof of one offense necessarily involves proof of the others. *Id.* "This means that the proof of one offense must be 'inextricably connected' with the proof

of the other . . . or that the proof of one offense forms a 'substantial portion of the proof' of the other offense." *Id.* The purpose of this inquiry is to evaluate whether the defendant is harassed or judicial resources are wasted by successive prosecutions. *Id.*

In *Johnson*, the Tennessee Supreme Court first "determined that the two charges against Mr. Johnson were not part of the same criminal episode because, based on the facts of this case, they did not occur simultaneously or in close sequence and did not occur in the same place or in closely situated places." *Id.* at 475-76. The court then proceeded to conclude likewise that the evidence was not inextricably linked, finding that at best the evidence of each offense was relevant to the other offense. *Id.* at 476.

In the case at bar, there is a substantial overlap in the evidence of the crime against Mr. Broyles and the June 11th crimes. Because the defendant's identity could only be established by the evidence linking him to the crime against Mr. Broyles, much of the evidence of that crime was ultimately introduced at trial. However, the Tennessee Supreme Court has also required that the offenses "must occur simultaneously or in close sequence and must occur in the same place or in closely situated places." *Johnson*, 342 S.W.3d at 475. "A break in the action may be sufficient to interrupt the temporal proximity required for a single criminal episode to exist." *Id.* Here, the evidence demonstrates that there was a break in the action. According to Mr. Gray's testimony, he and the defendant "stopped in some apartments and we sat over there for a while" after shooting Mr. Broyles. They then got into the car again and went to the Premiere Club, where they rode around the parking lot with a third man. They did not conceive the second crime until they saw the Crown Victoria sometime between 2:00 and 3:00 a.m. Around four or five hours passed between the first and second shooting. The defendant and Mr. Gray traveled from North Memphis to South Memphis and back again. Although there was a substantial overlap in evidence, the same would have been true if the second crime had occurred some weeks after the first. We conclude that the trial court did not err in concluding the offenses were not part of the same criminal episode based on a break in the action.

## II. Evidence of Prior Crimes

The defendant also objects to the trial court's decision to admit the evidence of the shooting of Mr. Broyles. Under Tennessee Rule of Evidence 404(b), evidence of another crime is "not admissible to prove the character of a person in order to show action in conformity with the character trait." It may, however, be admissible for other purposes. Tenn. R. Evid. 404(b). If the evidence establishes motive, intent, identity, absence of mistake, or common plan or scheme, or if it provides contextual background, it may be admissible. *State v. Little*, 402 S.W.3d 202, 210 (Tenn. 2013). Before the evidence can be admitted:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). The fourth requirement, weighing the probative and prejudicial value of the evidence, is more stringent than the general balancing test for relevant evidence under Tennessee Rule of Evidence 403. *State v. Gilliland*, 22 S.W.3d 266, 272 n.7 (Tenn. 2000). If the trial court is admitting the evidence for the purpose of contextual background, it must conclude that: (1) the absence of the evidence would create a chronological or conceptual void in the State's presentation of its case; (2) the void created by the absence of the evidence would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice. *Id.* at 272. If the trial court determines that the evidence is admissible, it should upon request "restrict the evidence to its proper scope and instruct the jury accordingly." *Little*, 402 S.W.3d at 210 (quoting Tenn. R. Evid. 105).

When a trial court has complied with the procedural requirements of Rule 404(b), the trial court's decisions under the Rule are reviewed for abuse of discretion. *State v. James*, 81 S.W.3d 751, 760 (Tenn. 2002). A court abuses its discretion when it applies an incorrect legal standard or reaches a decision which is against logic or reasoning and which causes an injustice to the complaining party. *Id.*

Generally, character evidence consisting of prior crimes is not admissible because "a real probability exists that the jury could be overwhelmed by the sheer volume of prejudicial evidence and that the jury could be tempted to convict based upon a defendant's propensity to commit crimes rather than convict solely upon evidence relating to the charged offense." *State v. Mallard*, 40 S.W.3d 473, 488 (Tenn. 2001) (quoting *Spicer*, 12 S.W.3d at 448). This danger is particularly great where the prior conviction is similar to the charged offenses. *James*, 81 S.W.3d at762.

-14-

In this case, the trial court properly held at least one hearing outside the presence of the jury on the 404(b) issue. The trial court then found that, as the defendant had pled guilty, the evidence of the prior crime was clear and convincing. The trial court determined that the evidence was relevant to two issues: identity and context. Noting that the evidence was extremely probative on the issue of identity and that the prosecution had to corroborate Mr. Gray's testimony, the trial court concluded that the probative value of the evidence was not outweighed by the danger of unfair prejudice. Accordingly, the State introduced the testimony of Mr. Broyles that the defendant looked exactly like one of the men who robbed him of his distinctive Chrysler 300, the video from the gas station at the time of the robbery, and Detective Gunn's testimony regarding the defendant's statement admitting his participation in the robbery. The trial court then gave the jury appropriate limiting instructions both prior to the introduction of evidence of the crime against Mr. Broyles and when the jury was charged.

The evidence in question was certainly relevant to the defendant's identity and in fact necessary to corroborate Mr. Gray's testimony. *See State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) ("[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it. . . .") (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn.1994) *superseded by statute on other grounds as stated in State v. Odom*, 137 S.W.3d 572, 580 (Tenn. 2004)). Because no eyewitnesses could link the defendant to the June 11th crimes, the probative value of the evidence was particularly high. Because the crime was very similar to the crimes for which the defendant was on trial, the risk of unfair prejudice was also elevated. *See James*, 81 S.W.3d at 762. Accordingly, the defendant disputes the trial court's decision that the probative value was not outweighed by the risk of unfair prejudice.

In *State v. Howell*, the defendant was charged with murder. At trial, the State introduced evidence of a murder committed in Oklahoma with the same weapon used in the Tennessee crime. *State v. Howell*, 868 S.W.2d 238, 245 (Tenn. 1993). During the Oklahoma murder, the defendant also robbed the Oklahoma victim of her car and left a car previously stolen in Tennessee. *Id.* The defendant was captured in Florida, where he engaged in a shoot-out with police using the same weapon employed in the Tennessee and Oklahoma murders; he was then apprehended in the Oklahoma victim's car. *Id.* at 245-46. Although the evidence of the Oklahoma murder was circumscribed, the testimony regarding the Florida shootings was detailed. *Id.* at 255. No limiting instruction was given. *Id.* The Tennessee Supreme Court concluded there was no error in the trial court's decision to admit proof of these crimes because they were necessary to establish the defendant's identity and their probative value accordingly outweighed their prejudicial effect. *Id.* Likewise, in *State v. Taylor*, the prosecution in a murder trial introduced evidence that bullets recovered from the

-15-

deceased victim, a gas station attendant, came from a gun which was in the possession of the defendant and which the defendant used to shoot another gas station attendant approximately one month later. *State v. Taylor*, 669 S.W.2d 694, 696 (Tenn. Crim. App. 1983). In that case, the trial court limited the second victim's testimony to the "bare essential facts that he was shot by the defendant, wrestled the gun from the defendant and kicked it away." *Id.* at 698. The witness also identified the defendant and the gun. *Id.* This court concluded that the evidence was properly admitted because the probative value was not outweighed by the prejudicial effect. *Id.*

We find the instant case indistinguishable from *Howell* and *Taylor*. The defendant's identity could only be established by linking him to the stolen vehicle and the weapon employed in another crime. Accordingly, the State introduced the testimony of Mr. Broyles that the defendant looked exactly like his assailant; evidence that Mr. Broyles had picked the defendant from a photographic lineup shortly after the event; the defendant's equivocal statement admitting participation; and the video from the carwash. The trial court did give and reiterate proper limiting instructions. Based on *Howell* and *Taylor*, we conclude that the trial court did not apply an incorrect legal standard or reach a decision which was against logic or reasoning when it concluded that the evidence's probative value on the issue of identity, which was extremely high, outweighed the risk of unfair prejudice.[2] Accordingly, there was no error admitting this evidence.

### III. Limited Cross-Examination of Sergeant Mullins

The defendant next contends that the trial court erred by limiting his cross-examination of Sergeant Mullins in that he was denied the ability to use leading questions to cross-examine Sergeant Mullins. He contends that this error deprived him of the opportunity to introduce evidence that Charles Owens had been involved in a prior altercation on the night of the homicide. He also contends that his open-ended questions led to the admission of hearsay on redirect examination, as the trial court ruled he had opened the door. A trial court's decision regarding the propriety, scope, manner, and control of cross-examination is reviewed for abuse of discretion. *State v. Echols*, 382 S.W.3d 266, 285 (Tenn. 2012). "The trial court abuses its discretion by unreasonably restricting a defendant's right to cross-examine a witness against him." *Id.*

---

[2]The trial court also based its ruling on the need to fill a conceptual void. While it appears that the evidence preponderates against this finding because Mr. Gray's testimony provided the necessary context, we need not decide the issue because the evidence was properly admitted as probative of identity. *See State v. Young*, No. E2010-00027-CCA-R3-CD, 2011 WL 1991732, at *19 (Tenn. Crim. App. May 23, 2011) ("Because the evidence of the Defendant's acts on December 1 was relevant to establish material issues other than a contextual background, a chronological or conceptual void was not required to render the evidence admissible.").

When the defendant attempted to cross-examine Sergeant Mullins regarding the incident with the green Expedition, the trial court held a jury-out hearing to determine whether the testimony the defendant desired to elicit was hearsay. The trial court concluded that, although the testimony regarding the incident itself was hearsay, the defendant could introduce it, accompanied by a limiting instruction, for the purpose of establishing the scope and reasonableness of Sergeant Mullins's investigation. While the defendant claims that he was forbidden from asking leading questions on cross-examination, the record reflects that the trial court was initially, during the jury-out hearing, curtailing defense counsel's questions in an attempt to limit any hearsay. The trial court then concluded that it would allow the hearsay testimony with a limiting instruction, and in response to this, defense counsel suggested, "So basically I just can't lead him on this." The record does not reflect that the trial court limited cross-examination; rather, this was the defendant's characterization of the ruling. Neither does it appear that the defendant's right to cross-examination was unreasonably restricted. The defendant was able to put on the proof of the confrontation in the parking lot, albeit with a limiting instruction. There was no abuse of discretion.

### IV. Hearsay Testimony

The defendant also asserts that limitations on his cross-examination of Sergeant Mullins led to the introduction of prejudicial hearsay on redirect and that the trial court erred in excluding the testimony of Charles Owens regarding the Expedition on a hearsay basis. A trial court has broad discretion in determining the admissibility of evidence, and its decision will only be reversed upon an abuse of that discretion. *State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005) (appendix); *State v. Baker*, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989). This standard of review also applies to the trial court's determinations regarding hearsay. *Pylant v. State*, 263 S.W.3d 854, 871 n.26 (Tenn. 2008). Generally, "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected," the party made a timely objection, and the substance of the evidence offered was before the trial court. Tenn. R. Evid. 103(a).

After Sergeant Mullins testified regarding the incident with the green Expedition, the prosecution was allowed to elicit testimony that his investigation focused on the defendant and Mr. Gray in part because of their ties to the shooting of Mr. Broyles and because both of them had been seen in the Chrysler at the Premiere Club. This testimony was also accompanied by a limiting instruction. Although the defendant claims that this testimony only came in because he could not ask leading questions, the trial court in fact allowed it to complete the picture of Sergeant Mullins's investigation. Essentially, it came in to rebut the exact testimony that the defendant had indicated he wanted before the jury. The hearsay was accompanied by limiting instructions, and the jury is presumed to have followed the trial court's instructions and to have limited its consideration of the proof regarding the

defendant's presence at the club to evaluating the reasonableness of Sergeant Mullins's investigation. *State v. Shaw*, 37 S.W.3d 900, 904 (Tenn. 2001).

The defendant also objects that the trial court did not allow Charles Owens to be questioned regarding the confrontation between the green Expedition and his girlfriend. Although the defendant frames this as a limitation on cross-examination, his objection is more properly characterized as an objection to the trial court's ruling on hearsay. The trial court, after a jury-out offer of proof, concluded that the bulk of Charles Owens's testimony would be hearsay, as he testified that he had no personal knowledge of anything that had occurred between the green Expedition and his girlfriend. Accordingly, his testimony was limited to establishing that the occupants of the vehicle had admired his car.

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted, and it is generally inadmissible. Tenn. R. Evid. 801(c), 802. Here, the defendant was attempting to offer a statement made by Charles Owens's girlfriend that someone in a green Expedition had hit her car and pointed a gun at her. The statement was offered for the truth of the matter asserted, as the defendant hoped it would cast suspicion on the persons in the Expedition. The proper way to introduce this testimony would have been through Charles Owens's girlfriend, and it was correctly excluded as hearsay. The defendant points to no exception to the rule against hearsay by which this statement could become admissible, and the trial court did not abuse its discretion in excluding it.

## V. Mistrial

The defendant next asserts that the trial court erred in denying his motion for a mistrial. The defendant based the motion on the contentions that the trial court had erred in not dismissing the charges based on mandatory joinder and that the evidence of the carjacking should not have been admitted.

A trial court's decision regarding a motion for a mistrial is reviewed for an abuse of discretion. *State v. Banks*, 271 S.W.3d 90, 137 (Tenn. 2008). "The purpose of declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Welcome*, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007). A motion for a mistrial should only be granted upon a showing of manifest necessity. *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003). A mistrial is only appropriate if the trial cannot continue or when its continuation would result in a miscarriage of justice. *State v. Robinson*, 146 S.W.3d 469, 494 (Tenn. 2004). The burden of establishing the necessity of a mistrial lies with the party seeking it. *State v. Reid*, 164 S.W.3d 286, 342 (Tenn. 2005).

The trial court's ruling regarding mandatory joinder is not a basis for a mistrial, as it concerns a pre-trial legal determination and is not based in some event that has occurred during trial to preclude an impartial verdict. *See* 9 David Louis Raybin, *Tennessee Practice: Criminal Practice and Procedure* § 16:69 (2013) ("Mistrials can result from numerous events which occur *during the trial of a case*.") (Emphasis added). We have determined above that the defendant's other basis, the improper admission of evidence, does not require reversal. Accordingly, there was no error in denying the motion for a mistrial.

## CONCLUSION

Based on the foregoing analysis, we affirm the judgments of the trial court. Because the judgment sheet for the reckless homicide conviction appears to show that the defendant received a life sentence for that crime, we remand for correction of that judgment form.

_____
JOHN EVERETT WILLIAMS, JUDGE